**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION LOCAL 1500, Individually and On Behalf of All Others Similarly Situated,<br><br>                          Plaintiff,<br><br>    vs.<br><br>INTEL CORPORATION,<br><br>                        Defendant. | Civil Action No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**LABATON SUCHAROW LLP**
Michael P. Canty
Ross M. Kamhi
140 Broadway
New York, NY 10005
Telephone: 212.907.0700
Facsimile: 212.818.0477
Email: mcanty@labaton.com
       rkamhi@labaton.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

Page

I.    NATURE OF THE ACTION ................................................................................. 1

II.    PARTIES ............................................................................................................. 4

III.    JURISDICTION AND VENUE .......................................................................... 4

IV.    FACTUAL ALLEGATIONS ............................................................................... 5

        A.    Intel and Central Processing Units ........................................................... 5

        B.    Researchers Identify Vulnerabilities Affecting Intel Computer Chips ................ 7

        C.    Meltdown and Spectre Exploit Intel's
            Efforts to Improve Computer Performance ............................................... 8

        D.    Fixing the Meltdown Flaw Dramatically Decreases Processing Speed ............... 11

        E.    According to Expert A, the Reported Performance
            Issues Would Significantly Impact the Price of Intel Products ......................... 14

V.    CLASS ACTION ALLEGATIONS ..................................................................... 16

VI.    CAUSES OF ACTION ....................................................................................... 18

COUNT I
BREACH OF IMPLIED WARRANTY ......................................................................... 18

COUNT II
VIOLATIONS OF THE MAGNUSON-MOSS WARRANTY ACT, 15
U.S.C. §2301, *et seq.* ................................................................................................... 20

COUNT III
VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349 ......................... 20

COUNT IV
VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350 ......................... 22

VII.    PRAYER FOR RELIEF ..................................................................................... 23

VIII.    JURY TRIAL DEMANDED .............................................................................. 23

Plaintiff, the United Food and Commercial Workers International Union Local 1500 ("Plaintiff"), individually and on behalf of all other similarly situated, by its undersigned attorneys, brings this class action complaint against Defendant Intel Corporation ("Intel" or the "Company") based on personal knowledge as to itself and upon information and belief as to all other matters, based on the investigation of counsel.

## I.   NATURE OF THE ACTION

1.     Intel is the world's most prolific and well-known manufacturer of computer chips. More than 90 percent of all computers in the world include Intel chips.

2.     Intel's success is driven in large party by its ability to regularly improve the speed and performance of its computer chips. Intel's co-founder, Gordon Moore, accurately predicted that Intel would decrease the size of its computer chips every two years—a rate now known as Moore's Law—and Moore's contemporaries further predicted that overall performance of a chip would double every 18 months. This dramatic improvement of performance is reflected in the price of Intel's computer chips: the faster the speed, the higher the price.

3.     To increase the speed and performance of its computer chips, Intel designed them to rely heavily on a process known as "speculative execution." Speculative execution improves a chip's efficiency because the process enables a computer to perform a number of different tasks out of order and ahead of time in anticipation that the results of one of those tasks will be needed in the future.

4.     Although speculative execution increases speed and performance, it also compromises the security of a computer. Indeed, since as early as 1995, unbeknownst to the public, Intel has been selling computer chips that suffer from two significant security flaws, both of which take advantage of Intel's aggressive reliance on speculative execution to improve the performance of its chips.

5.      Details of the security vulnerabilities became public on January 2, 2018, when it was revealed that Google researchers identified two security flaws—known as Meltdown and Spectre—that affect all computers containing Intel chips—***i.e., nearly every computer in the world***.

6.      Meltdown and Spectre allow a non-privileged user (i.e., a hacker) to access information on a computer that the hacker should not be able to access, such as secret keys, usernames, passwords, and any other sensitive information a user enters into a computer. The flaws are so significant that one of the researchers who discovered them referred to Meltdown specifically as "probably one of the worst CPU bugs ever found."[1]

7.      Although the details of Meltdown and Spectre first became public on January 2, 2018, Intel reportedly first learned about the defects by as early as June 2017, and yet Intel continued to manufacture, market, and sell defective chips in the interim.

8.      Only a complete redesign of Intel chips can completely resolve the Meltdown and Spectre security flaws. Installing a software "patch" or update can potentially resolve the Meltdown flaw (Spectre can only be completely fixed by replacing the hardware), but these software patches dramatically slow down computer performance. One such patch has been shown to slow down a computer by up to 30 percent,[2] and Microsoft has reported that a patch for Windows operating systems results in significant slowdowns.[3] Intel itself has acknowledged that computers that are patched have shown a decrease in performance of between 2 and 25 percent

---

[1] Samuel Gibbs, *Spectre and Meltdown processor security flaws – explained*, The Guardian (Jan. 4, 2018).

[2] Rob Thubron, *Massive security flaw found in Intel CPUs, patch could hit performance by up to 30%*, Techspot (Jan. 3, 2018).

[3] Terry Myerson, *Understanding the performance impact of Spectre and Metldown mitigations on Windows Systems*, Microsoft Secure, https://cloudblogs.microsoft.com/microsoftsecure/2018/01/09/understanding-the-performance-impact-of-spectre-and-meltdown-mitigations-on-windows-systems/

and are rebooting more than usual.[4] The reboot problem became so significant that on January 22, 2018, Intel announced that the patches it had released were faulty and advised customers ***not*** to install them until a new patch it is developing becomes available.[5]

9.      Plaintiff retained an expert in microprocessor chips who worked at Intel from 1992 to 2004 as a director of CPU and chip development and has over 25 years of industry experience working on CPU and memory chip development ("Expert A"). Expert A estimated that a 10% decrease in performance of a chip corresponds to a 10% decrease in price. Thus, a $200 chip that experiences a 10% performance decrease (when a patch is added) diminishes the value of that chip by approximately $20.

10.      The decrease in performance of Intel's chips is especially damaging to Plaintiff and Class members because Intel's products are sold specifically on performance and are priced accordingly. Intel's chips would have been sold at a much lower price had they been priced to reflect the speed at which they perform when patched.

11.      Now, Plaintiff and Class members are forced to either use a chip that is vulnerable to a dangerous security flaw or install a patch that significantly reduces performance (and yet still remains vulnerable to future attacks).

12.      Plaintiff and the Class, who paid a premium for Intel-designed chips, have suffered ascertainable injuries and loss of money or property as a result of Defendant's wrongful conduct. Indeed, had Plaintiff and the Class known about the security flaws and the need for a

---

[4] *Intel Fix Causes Reboots and Slowdowns*, BBC News (Jan. 18, 2018) *http://www.bbc.com/news/technology-42733032.*

[5] Intel Newsroom, *Root Cause of Reboot Issue Identified; Updated Guidance for Customers and Partners* (Jan. 22, 2018), https://newsroom.intel.com/news/root-cause-of-reboot-issue-identified-updated-guidance-for-customers-and-partners/

security patch that would slow performance, they would not have purchased Intel chips (or devices containing them) or would have paid substantially less for them.

## II.    PARTIES

13.    Plaintiff the United Food and Commercial Workers International Union Local 1500 ("UFCW Local 1500") is a labor union headquartered in New York. UFCW Local 1500 represents over 20,000 workers in New York in industries including agriculture, health care, food processing, retail food, and manufacturing, among others. UFCW Local 1500 purchased computers and servers that contain Intel CPUs.  Plaintiff was unware of the Meltdown and Spectre security flaws described herein when it purchased those computers and servers. Had UFCW Local 1500 known of the security flaws, and the need to install a performance-reducing patch on its computers and servers to resolve them that would decrease the value of the chips (as described herein), Plaintiff would not have purchased the computers and servers with Intel chips or would have paid substantially less for them.

14.    Defendant Intel is a Delaware corporation headquartered at 2200 Mission College Boulevard, Santa Clara, California. Intel is licensed to and does business throughout the State of New York and the United States. Intel designs, manufactures, distributes, and sells computer products worldwide.

## III.    JURISDICTION AND VENUE

15.    Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"), because (i) the proposed Class consists of well over 100 members; (ii) the parties are minimally diverse, as members of the proposed Class are citizens of a state different from Defendant's home state; and (iii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs.

16. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

17. This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction. This Court has personal jurisdiction over Defendant Intel because Intel has sufficient minimum contacts with New York, either directly or through its subsidiaries, and has otherwise purposefully availed itself of the markets in New York through the marketing and sale of its products in New York.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant Intel is registered to do business in this District, maintains an office in this District, and regularly conducts business in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    Intel and Central Processing Units

19. Intel is a technology company that designs and manufactures the world's most widely used microprocessor chips. ***More than 90 percent of all computers in the world use Intel chips***.[6]

20. A microprocessor chip is the main component of all desktop and laptop computers and is often referred to as the "brain" of a computer. The key functional block of a microprocessor chip is a central processing unit ("CPU"), which functions as a calculator that can quickly execute operations (add, subtract, multiply, divide, etc.) at billions of times per second. When a user commands a computer program to perform a function, the CPU carries out that command, working with the other parts of the system to perform the desired task.

---

[6] Cade Metz and Nicole Perlroth, *Researchers Discover Two Major Flaws in the World's Computers*, N.Y. Times (Jan. 3, 2018).

21.     Microprocessor chips (and, therefore, CPUs) are also key components of other consumer electronics, including tablet computers, smart phones, and flat-screen televisions. Intel sells its chips as stand-alone component parts, as well as to third-party manufacturers, such as Dell Inc., HP Inc., and Apple Inc., who incorporate Intel's chips into a wide range of computer products and devices.

22.     The performance of computer chips has improved dramatically over the last four decades due to constant improvements to the underlying technology. This improvement is set at a rate forecasted by Moore's Law. Named after Intel's co-founder, Gordon Moore, Moore's Law predicts that "the number of transistors incorporated into a chip will approximately double every 24 months." Put differently, Moore observed that a doubling of the number of transistors over a given area on a computer chip had been occurring approximately every two years, and projected that this trend would continue into the future.

23.     David House, a colleague of Moore's at Intel, later factored in increased performance of individual transistors to conclude that overall performance of circuits would double every 18 months.[7] This means that every two years the size of a computer chip would decrease and its speed and performance would more than double, which also has an effect on price: the faster the speed of a chip, the higher its price.

24.     Intel produces some of the fastest computer chips in the world and prices them accordingly. Intel also touts the speed of its chips when marketing them and sells them on this basis.

---

[7] Michael (Siyang) Li, *Keeping Up With Moore's Law*, Dartmouth Undergraduate J. of Sci. (May 29, 2013).

### B.    Researchers Identify Vulnerabilities Affecting Intel Computer Chips

25.    On January 3, 2018, a team of researchers at Google's Project Zero announced that they had discovered two major security flaws in the microprocessor chips found in nearly every computer in the world, including Intel chips. The release stated, in part:

> We have discovered that CPU data cache timing can be abused to efficiently leak information out of mis-speculated execution, leading to (at worst) arbitrary virtual memory read vulnerabilities across local security boundaries in various contexts.
>
> Variants of this issue are known to affect many modern processors, including certain processors by Intel, AMD and ARM. For a few Intel and AMD CPU models, we have exploits that work against real software. We reported this issue to Intel, AMD and ARM on 2017-06-01.[8]

26.    Numerous articles discussing the significance of the two security flaws, known as Meltdown and Spectre, immediately followed. *The New York Times*, for instance, published an article that same day titled "Researchers Discover Two Major Flaws in the World's Computers," which stated:

> Computer security experts have discovered two major security flaws in the microprocessors inside nearly all of the world's computers.
>
> The two problems, called Meltdown and Spectre, could allow hackers to steal the entire memory contents of computers, including mobile devices, personal computers and servers running in so-called cloud computer networks.[9]

27.    Although the researchers who discovered the flaws publicized their findings in January 2018, they first notified Intel of the issue in June 2017. In late November 2017, while aware of the issue but before it became public, Intel's CEO, Brian Krzanich, sold $24 million of

---

[8] Jann Horn, *Reading privileged memory with a side-channel*, Google Project Zero (Jan. 3, 2018).

[9] Cade Metz and Nicole Perlroth, *Researchers Discover Two Major Flaws in the World's Computers*, N.Y. Times (Jan. 3, 2018).

Intel stock, leaving Krzanich with merely 250,000 shares of Intel stock—the minimum amount of shares his employment agreement allows him to hold.[10]

### C.    Meltdown and Spectre Exploit Intel's Efforts to Improve Computer Performance

28.    Meltdown and Spectre present different security risks (and require different mitigating fixes) but both have one thing in common: the two vulnerabilities allow a non-privileged user (i.e., a hacker) to access information on a computer that the hacker should not be able to access—information including secret keys, passwords, or any other information sensitive information stored on a computer.[11]

29.    Both flaws allow attackers to gain unauthorized access to computer memory and Meltdown can even attack a crucial feature of a computer's operating system known as the "kernel." The kernel performs a wide range of important functions, but one of its most significant responsibilities is to prevent data in one program (or application) from being read by another. As detailed in *Figure 1* below, the kernel connects the application software to the basic hardware of a computer, such as the CPU, the computer's main memory, and the device itself.



*Figure 1*

---

[10] Troy Wolverton, *Intel sas Aware of the chip vulnerability when its CEO sold off $24 million in company stock*, Business Insider (Jan. 3, 2018).

[11] Ben Thompson, *Meltdown, Spectre, and the State of Technology*, Stratechery (Jan. 8, 2018).

30.     To maintain security, the kernel also acts as a barrier between the computer's main memory and other parts of a computer. The computer's main memory includes the computer's dynamic random-access memory ("DRAM"), as well as what is known as "kernel memory." Kernel memory is a protected area of memory used by the operating system and contains a computer's most confidential information, such as passwords and encryption keys.

31.     Intel's success at creating faster and faster computer chips ultimately exposed those chips to Meltdown and Spectre. This is because both exploits take advantage of a foundational feature of computer processing known as "speculative execution"—a performance-enhancing process that Intel pursued aggressively at the expense of computer security.

32.     Speculative execution means that a computer will perform a number of different tasks out of order (i.e., speculatively) and ahead of time in anticipation that the results of one of those tasks will be needed in the future.  Although speculative execution of instructions increases efficiency, the process can also introduce security flaws if not performed correctly, because speculative execution moves sensitive data from a computer's main memory to its less secure "cache" memory, where it can be processed more efficiently. This increases speed, but it also leaves data more exposed because data in the "cache" memory is more vulnerable to unauthorized access than when it is stored in the main memory.

33.     Intel was particularly aggressive in allowing its chips to perform tasks speculatively, which ultimately made its chips more vulnerable to security flaws that exploit this process. Indeed, both Meltdown and Spectre enable a hacker to use speculative execution to "trick" a computer into moving sensitive information into cache memory, where it can be more easily viewed.



*Figure 2*

34.    Although both Meltdown and Spectre exploit speculative execution, they do so in slightly different ways.

35.    Meltdown allows a hacker to move the highly-sensitive data stored in kernel memory to the cache memory. The hacker can then use any program on the computer to access information moved to the cache memory (if the sensitive data were still in kernel memory, the hacker would not be able to access it). Meltdown has been described by one of the researchers who discovered the flaw as "probably one of the worst CPU bugs ever found."[12]

36.    Spectre does not involve kernel memory, but instead allows hackers to trick otherwise error-free applications into providing sensitive information to the cache memory. There are two variants of the Spectre flaw—the branch-prediction variant and the array-bounds

---

[12] Samuel Gibbs, *Spectre and Meltdown processor security flaws – explained*, The Guardian (Jan. 4, 2018).

variant—both of which allow a hacker to train or trick a computer to perform a speculative execution task that makes sensitive data more accessible.

37.    Meltdown is a flaw that predominately affects Intel-designed chips, and impacts nearly every Intel chip since 1995—i.e., ***approximately 90 percent of all devices***. Spectre affects ***virtually every microprocessor on the market***, including those designed by Intel.

### D.    Fixing the Meltdown Flaw Dramatically Decreases Processing Speed

38.    The only way Intel can completely eliminate the Meltdown and Spectre flaws is to entirely redesign its chips. Replacing a computer chip will not resolve the issue either because, according to some indications, ***there are no chips currently being made that are not defective***.[13]

39.    The Meltdown flaw can be fixed, however, by installing a "patch" of software code on a computer's operating system.

40.    Updates for the three main computer operating systems—Microsoft's Windows, Apple's Mac OS, and Linux—that would purportedly fix the Meltdown flaw have either been released or are currently in development. Additional security updates will likely be needed to further resolve the problem.

41.    Although a security patch purportedly resolves the Meltdown flaw, it has been reported that a patch significantly impacts and slows down computer performance.[14] One such fix, known as the Kernel Page Table Isolation, is said to cause the computer program to slow down by ***up to 30 percent***.[15]

---

[13] Chris O'Brien, *CERT: Only Way To Fix Meltdown and Spectre Vulnerabilities Is To Replace CPU*, Venture Beat (Jan. 4, 2018).

[14] Tom Warren, *Intel's Processors Have a Security Bug and the Fix Could Slow Down PCs*, The Verge (Jan. 3, 2018).

[15] Rob Thubron, *Massive Security Flaw Found in Intel CPUs, Patch Could Hit Performance By Up to 30%*, Techspot (Jan. 3, 2018).

42.     Microsoft issued a release on its website that details how security patches may impact computer performance, revealing that for many devices Microsoft "expect[s] that some users will notice a decrease in system performance."[16] The performance impact will be particularly pronounced computers running on an older Intel chip and older Windows 7 or 8 operating systems.[17]

43.     Despite reports that the software patches slow down computer performance, Intel has largely downplayed the significance of the performance impact. On January 3, 2018, an Intel spokesperson stated: "Any performance impacts are workload-dependent, and, for the average computer user, should not be significant and will be mitigated over time."[18]

44.     On January 9, 2018, Intel issued a press release in which it again suggested that performance impact would be workload dependent, but acknowledged that computers that are patched have shown a decrease in performance of between 2 and 14 percent:

> Based on our tests on SYSmark 2014 SE, a leading benchmark of PC performance, 8th Generation Core platforms with solid state storage will see a performance impact of 6 percent or less. (SYSmark is a collection of benchmark tests; individual test results ranged from 2 percent to 14 percent.)[19]

---

[16] Terry Myerson, Understanding the Performance Impact of Spectre and Metldown Mitigations on Windows Systems, Microsoft Secure, https://cloudblogs.microsoft.com/microsoftsecure/2018/01/09/understanding-the-performance-impact-of-spectre-and-meltdown-mitigations-on-windows-systems/.

[17] *Id.*

[18] Tom Warren, *Intel says processor bug isn't unique to its chips and performance issues are 'workload-dependent*, The Verge (Jan. 3, 2018).

[19] Intel Newsroom, Intel Offers Security Update (Jan. 9, 2018), https://newsroom.intel.com/news/intel-offers-security-issue-update/.

45.     Then, on January 17, 2018, Intel revealed that its test showed a reduction in performance ranging from 2 to 25 percent and that devices are rebooting more than usual after being patched.[20]

46.     Intel continued to give customers mixed messages on January 22, 2018, when the Company announced that it was working on a new patch that would stop the rebooting problem and advised customers *not* to install the previously released patch until the new patch is available.[21]

47.     Intel's unwillingness to fully admit the extent of the performance impact is not surprising: Intel's products are sold specifically on performance speed and are priced accordingly.

48.     If Intel's computer chips were priced to reflect the speed at which they perform when patched, they would have been sold at a significantly lower price. Thus, had Plaintiff and the Class known about the security flaws and the need for a security patch that would slow performance, they would have paid substantially less for Intel's chips.

49.     Unlike Meltdown, Spectre cannot be mitigated with a patch because it is a problem with the fundamental way the processor is designed, and therefore requires the hardware (i.e., the computer chip) to be replaced entirely.[22] According to Expert A, however, there currently is no CPU replacement that can completely fix the Spectre flaw because a complete fix requires changes in the chip architecture that are only currently in the development phase.

---

[20] *Intel Fix Causes Reboots and Slowdowns*, BBC News (Jan. 18, 2018) *available at* http://www.bbc.com/news/technology-42733032.

[21] Intel Newsroom, *Root Cause of Reboot Issue Identified; Updated Guidance for Customers and Partners* (Jan. 22, 2018), https://newsroom.intel.com/news/root-cause-of-reboot-issue-identified-updated-guidance-for-customers-and-partners/

[22] Cade Metz and Nicole Perlroth, *Researchers Discover Two Major Flaws in the World's Computers*, N.Y. Times (Jan. 3, 2018).

50.     Intel knew or should have known of the Meltdown and Spectre flaws many years ago given that Intel was best positioned to discover the defects—which ultimately were discovered by third-party researchers without access to Intel's proprietary information. To the extent Intel was not aware of the flaws, the Company's failure to discover them was either negligent or reckless.

51.     When Intel ultimately learned about the flaws—as early as June 2017—Intel continued to sell its defective chips to unknowing consumers at prices that were significantly higher than what consumers would have paid had they known the truth about Intel's chips.

### E.     According to Expert A, the Reported Performance Issues Would Significantly Impact the Price of Intel Products

52.     Plaintiff consulted an expert on CPU chips and cache memory. Expert A has a Ph.D in Electrical Engineering and worked at Intel from 1992 to 2004 as a director of CPU and chip development and has over 25 years of industry experience on CPU and cache memory. Expert A has also been a consultant to a semiconductor company for 14 years working on CPU and memory chips. Specifically, Expert A has industry experience working on many aspects of CPU and cache memory: computer chip transitor development, CPU and memory testing, timing, reliability and yield, and standard cell and memory design. Expert A was also the technology group member for Intel's CPU strategic long-range planning group and ran Intel's task forces to push CPU performance. While at Intel, Expert A was the program manager for the technology that is used in all of Intel's advanced logic chips as well as other modern computer chips, such as those found in not just computers, but also Apple and Samsung mobile phones.

53.     After leaving Intel, Expert A has been a tenured professor of Electrical and Computer Engineering at one of the country's largest public universities, where he teaches, among other things, undergraduate and graduate level courses on CPU and memory design and

- 14 -

manufacturing. Expert A has over 70 granted patents and 60 publications all in the field of chip development.

54.    Expert A confirmed that Intel's aggressive use of speculative execution ultimately caused the Meltdown and Spectre flaws. According to Expert A, these flaws trick a "victim" CPU into speculatively performing operations that would not occur during correct program execution. An attack program can move a victim's confidential information to cache memory, which is stored on the CPU chip. As Expert A explained, cache memory is local in time and space to the CPU and is physically located on the same chip as the CPU, whereas the computer's main memory is located off the chip. Once confidential information is moved to cache memory, it is then susceptible to unauthorized access by a hacker.

55.    Expert A explained that the underpinnings of these attacks is that the CPU executes software (and moves data to cache memory) before a computer's safety checks are performed. Even if a security check fails, the confidential data, which is now located in cache memory, will remain in cache memory and not be "flushed" (i.e., removed) from the cache.

56.    With respect to the performance impact of patched Intel chips, Expert A explained that a decrease in performance (after a patch is added) corresponds to a decrease in a chip's value, which can be quantified in dollar figures. According to Expert A, a 10% decrease in performance corresponds to a 10% decrease in price. Thus, a $200 chip that experiences a 10% performance decrease (when a patch is added) diminishes the value of that chip by approximately $20.

57.    Expert A also explained that no chip exists that does not suffer from the Spectre flaw because it can only be completely fixed with a complete redesign of a chip's architecture— a fix that is still only in development. As a result, Expert A explained, any chip that suffers from

the Spectre flaw (even after a performance-diminishing patch is added to address Meltdown) has

further decreased value.

## V.    CLASS ACTION ALLEGATIONS

58.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 ("Rule

23") on behalf of itself and a class of other similarly situated individuals (the "Class"), as defined

specifically below:

> All persons and entities within the United States who purchased
> one or more Intel CPUs from Intel or its authorized retailers or
> sellers, or one or more devices containing Intel CPUs.

59.    Plaintiff also brings this action pursuant to Rule 23 on behalf of itself and the

following subclass for Class members in New York (the "New York Subclass"):

> All persons and entities within the State of New York who
> purchased one or more Intel CPUs from Intel or its authorized
> retailers or sellers, or one or more devices containing Intel CPUs.

60.    The Class and New York Subclass shall be referred to collectively throughout the

Complaint as the Class.

61.    Excluded from the Class is Defendant; any person who is an officer, director,

partner or controlling person of Defendant, including any of its subsidiaries or affiliates; any

entity in which Defendant has a controlling interest; and the legal representatives, heirs,

successors and assigns of any such excluded person or entity.

62.    Plaintiff satisfies the numerosity, commonality, typicality, and adequacy

prerequisites for suing as a representative party pursuant to Rule 23.

63.    **Numerosity**. More than 90 percent of all computers sold in the United States

contain Intel CPUs that are affected by the Meltdown and Spectre security flaws. Over 84% of

all U.S. households own a computer, i.e., over 272 million people. Joinder is therefore

impracticable and the numerosity requirement of Rule 23 is easily satisfied here.

64.    **Commonality**.  Plaintiff's and Class members' claims raise predominately common factual and legal questions that can be answered for all Class members through a single class-wide proceeding. For example, to resolve any Class member's claims, it will be necessary to answer the following questions, and the answer to each of these questions will necessarily be the same for each Class member.

(a)    whether Intel's chips or CPUs are affected by the Meltdown and Spectre flaws;

(b)    whether Intel made any implied warranties in connection with its sale of its defective chips or CPUs;

(c)    whether Intel breached any implied warranties relating to its sale of defective chips or CPUs by failing to resolve the Meltdown and Spectre security flaw in a manner required by law;

(d)    whether Intel violated New York consumer protection law; and

(e)    whether Plaintiff and Class members are entitled to damages or other relief.

65.    **Typicality.** Plaintiff's claims are typical of the claims of the members of the Class. Among other things, Plaintiff and Class members all purchased products containing defective Intel CPUs and all sustained injuries based on the same improper conduct.

66.    **Adequacy**. Plaintiff will adequately represent the proposed Class members.  It has retained counsel competent and experienced in class action litigation and intends to pursue this action vigorously.  Plaintiff has no interests contrary to or in conflict with the interests of Class members.

67.     In addition to satisfying the prerequisites of Rule 23(a), Plaintiff satisfies the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual members and a class action is superior to individual litigation. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## VI.     CAUSES OF ACTION

### COUNT I
### BREACH OF IMPLIED WARRANTY

68.     Plaintiff repeats and re-alleges every allegation set forth above as if fully set forth herein.

69.     Defendant Intel and its authorized agents are resellers who sold Intel computer chips and CPUs to Plaintiff and Class members in the regular course of business.

70.     Defendant impliedly warranted to members of the general public, including Plaintiff and Class members, that these computer chips and CPUs were of merchantable quality—i.e., that they were of high enough quality to make fit for sale, usuable for the purpose for which they were made, of average worth in the marketplace, or not broken, unworkable, damaged, contaminated, or flawed—were of the same quality as those generally acceptable in the trade or that would pass without objection in the trade, were free from material defects, and were reasonably fit for the ordinary purposes for which they were intended or used.

71.     Defendant Intel either was or should have been aware of the particular purposes for which such chips and CPUs are used, and that Plaintiff and the Class members were relying on the skill and judgment of Intel to furnish suitable goods for such purpose.

72.     Pursuant to agreements between Defendant Intel and its authorized agents and resellers, the stores Plaintiff and Class members purchased their defective Intel chips and CPUs

from are authorized retailers and authorized CPU service facilities. Plaintiff and Class members are therefore third-party beneficiaries of, and substantially benefited from, such contracts.

73.     Defendant Intel breached its implied warranties by selling Plaintiff and the Class members defective Intel chips and CPUs. The defects render the Intel chips and CPUs unmerchantable and unfit for their ordinary or particular use or purpose. Defendant Intel has refused to recall, repair, or replace, free of charge, all Intel chips and CPUs or any of their defective component parts or refund the prices paid for such CPUs.

74.     The defect in the Intel chips and CPUs existed when the chips and CPUs left Intel's and their authorized agents' and retail sellers' possession and thus is inherent in those products.

75.     As a direct and proximate result of Intel's breach of its implied warranties, Plaintiff and Class members have suffered damages and continue to suffer damages, including economic damages at the point of sale in terms of the difference between the value of the chips and CPUs as warranted and the value of the chips and CPUs as delivered. Additionally, Plaintiff and Class members either have or will incur economic, incidental, and consequential damages in the cost of repair or replacement and costs of complying with continued contractual obligations as well as the cost of buying an additional chips and CPU they would not have purchased had the chips and CPUs in question not contained the non-repairable defect.

76.     Plaintiff and Class members are entitled to legal and equitable relief against Defendant Intel, including damages, specific performance, rescission, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT II
## VIOLATIONS OF THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C.§2301, *et seq.*

77.     Plaintiff repeats and re-alleges every allegation set forth above as if fully set forth herein.

78.     The Magnuson-Moss Warranty Act ("MMWA") defines "implied warranty" as any implied warranty arising "under State law . . . in connection with the sale by a supplier of a consumer product." MMWA 15 U.S.C. § 2301.

79.     As defined by the MMWA, Plaintiff and Class members are "consumers," Defendant is a "supplier" and the defective chips or CPUs are "consumer products." MMWA 15 U.S.C. § 2301.

80.     Defendant Intel impliedly warranted that Intel's chips or CPUs were merchantable and fit for the ordinary and particular purpose for which they were used.

81.     Defendant Intel breached the implied warranty by delivering chips or CPUs that were neither merchantable nor fit for the ordinary and particular purpose for which the chips or CPUs were used.

82.     As a direct and proximate result of Defendant's breach of the implied warranty or merchantability, Plaintiff and Class members have been damaged.

## COUNT III
## VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349

83.     Plaintiff repeats and re-alleges every allegation set forth above as if fully set forth herein.

84.     New York General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

85.     Defendant Intel conducts business and trade within the meaning of New York General Business Law § 349.

- 20 -

86.     Defendant Intel's conduct, as alleged herein, was consumer oriented because it sold its defective chips and CPUs, either directly or to authorized agents or resellers, to Plaintiff and the Class, who purchased Intel's products for their personal use.

87.     Defendant Intel's unlawful and deceptive consumer-oriented conduct is misleading in a material way because Defendant Intel induced Plaintiff and the Class to pay a premium for chips and CPUs that purportedly performed at a certain speed but were not actually capable of performing at that speed when those products were operating safely. Plaintiff and the Class, acting reasonably under the circumstances, therefore paid a price for Intel chips and CPUs that they would not have had they known the truth. Defendant Intel made its untrue and misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

88.     Plaintiff and the Class suffered injury as a result of Defendant Intel's deceptive acts because they paid a premium for Intel chips and CPUs that were vulnerable to hacking and not capable of performing as Intel represented when accounting for the need to resolve the security flaws. Accordingly, Plaintiff and the Class received less than what they bargained and/or paid for.

89.     Defendant Intel's deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law § 349(a) and Plaintiff and the Class have been damaged thereby.

90.     As a result of Defendant's recurring unlawful deceptive acts and practices, Plaintiff and the Class are entitled to monetary, compensatory, treble, and punitive damages, injunctive relief, restitution and disgorgement of all moneys obtained by means of Defendant Intel's unlawful conduct, interest, and attorneys' fees and costs.

## COUNT IV
## <u>VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350</u>

91.    Plaintiff repeats and re-alleges every allegation set forth above as if fully set forth herein.

92.    New York General Business Law § 350 prohibits false advertising in the conduct of any business, trade, or commerce. False advertising constitutes advertising, including labeling, of a commodity in a manner that is misleading in a material respect.

93.    Defendant Intel falsely advertised its chips and CPUs because Defendant Intel failed to disclose the security flaws those products suffered from and that resolving those flaws would require fixing Intel's chips and CPUs in a manner that would significantly slow down performance.

94.    Plaintiff and Class members have been injured as a result of Defendant Intel's conduct inasmuch as they purchased Intel's chips and CPUs in reliance on Defendant's representations.

95.    Defendant Intel's advertising induced Plaintiff and the Class to purchase Defendant's products.

96.    As described herein, Defendant' advertising included untrue and misleading statements and omissions, which Defendant Intel made willfully, wantonly, and with reckless disregard for the truth.

97.    Defendant Intel's conduct, as described herein, constitutes false advertising in the conduct of business, trade, or commerce in violation of New York General Business Law § 350 and Plaintiff and the Class have been damaged thereby. Specifically, as a result of Defendants' conduct, Plaintiff and the Class paid a premium for Intel chips and CPUs that were vulnerable to hacking and not capable of performing as Intel represented when accounting for the need to

resolve the security flaws. Accordingly, Plaintiff and the Class received less than what they bargained and/or paid for.

98.     Defendant Intel's material misrepresentations and omissions were substantially uniform in content, presentation, and impact on consumers at large, including Plaintiff and the Class.

99.     As a result of Defendant's recurring unlawful deceptive acts and practices, Plaintiff and the Class are entitled to monetary, compensatory, treble, and punitive damages, injunctive relief, restitution and disgorgement of all moneys obtained by means of Defendant Intel's unlawful conduct, interest, and attorneys' fees and costs.

## VII.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and the other members of the Class, prays for judgment as follows:

(a)     Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff as representatives of the Class, and appointing its counsel as Class Counsel;

(b)     Awarding damages, including, but not limited to, compensatory, statutory, and punitive damages, to Plaintiff and Class members in an amount to be determined at trial;

(c)     Awarding Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

(d)     Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable; and

(e)     Awarding such other and further relief as equity and justice may require.

## VIII.    **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury of all issues so triable.

DATED:  January 26, 2018

LABATON SUCHAROW LLP


By:  /s/ Michael P. Canty__
Michael P. Canty
Ross M. Kamhi
140 Broadway
New York, NY 10005
Telephone: 212.907.0700
Facsimile: 212.818.0477
Email: mcanty@labaton.com
        rkamhi@labaton.com

*Attorneys for Plaintiff United Food and
Commercial Workers International Union
Local 1500*